# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

Sandra Gray-Rohan,
    Plaintiff,

v.

Gateway Technical College,
    Defendant

Case No. 19-cv-1032

UNITED STATES COURTS
EASTERN DISTRICT OF WISCONSIN
FILED

JUN 1 3 2025

11:59 PM
AFTER HOURS

## Brief

The plaintiff worked at a Design agency (corporate design agency) for six years before applying for the desktop publisher job position at Gateway Technical College in June of the year, 2000. (1)

The Plaintiff was offered the position in August of the year 2000. The plaintiff's supervisor was Chuck Wood (director of marketing). The plaintiff applied for reclassification of her job position (desktop publisher) in 2002, 2004, and 2005, and the plaintiff was denied. (2)

The plaintiff contacted Jacqueline Morris (associate director of personnel management) to get a copy of the results. The plaintiff received the results in numerical code. Morris stated to the plaintiff, "You should be educated enough to figure it out and hung up the phone". Jacqueline Morris (associate director of personnel management) told the plaintiff the results are retained in the human resources department. (3)

1

In 2005, Dr. Sam Borden (the president of the college) phoned Jacqueline Morris (associate director of personnel management) and requested she setup a meeting to explain the results until the plaintiff fully understood the document. The plaintiff (non-lead graphic designer-black female) invited the union rep as an advocate, and her new supervisor Jayne Herring (replaced Chuck Wood) to sit in on the discussion to learn the process. (4)

In December of 2005, after the meetings, Morris and the GESP union sent the revised reclassification request to Bjorklund Agency (3rd-party reviewer). Bjorklund reviewed and recommended both the printshop lead graphic designer and the non-lead graphic designer to be allocated to pay grade 11 based on their job descriptions. (5)

The plaintiff (non-lead graphic designer-black female) received an approval in January 2006 and was reclassified from pay grade 10 to pay grade 11. Print shop lead graphic designer (white female), Sandy Kolbow (Dembroski) was notified from HR that her position was reclassified from a pay grade 11 to a pay grade 12 and told the plaintiff she was now a pay grade of 12 in 2006. (6)

In February of 2014, Morris confirmed with Bjorklund the printshop lead graphic designer's (white female) pay grade was 12. It was 12 in 2006, 2009, and 2014. The plaintiff (non-lead graphic designer - black female) was discriminated by pay and Compensation working a position with minimal differences same as the print shop lead graphic designer (white female) receiving less pay violating the plaintiff rights. (7)

2

Jacqueline Morris, state employee, allegedly abusing her power of authority, misleading, and not following a regularly adopted policy, practice and procedures of reclassifying employees to get the recommendation of Bjorklund Compensation Consulting before assigning the pay grade, of the plaintiff, working for the state of Wisconsin at Gateway Technical College negatively effecting the Plaintiff's point calculations determined by the plaintiff's job description used by Bjorklund (3rd party) to properly address the level of the position, directly effecting the plaintiffs pay and compensation. (8)

Jayne Herring, state employee, allegedly abusing her power of authority, excluding duties performed by the plaintiff and using low level terminology describing mental effort, problem-solving, and decision-making in comparison to the plaintiff's coworkers (Greg Lebrick (white male) and Annmarie Klyzub-Ruggierro (white Female) and refusing the request to resolve and revise the plaintiff's job description, negatively effecting the Plaintiff's point calculations determined by the plaintiff's job description used by Bjorklund (3rd party) to properly address the level of the position directly effecting the plaintiffs pay and compensation. (9)

In 2009, The printshop lead graphic designer (Sandy Kolbow-Dembroski) retired. Jayne Herring (Director of Marketing) announced to the marketing department employees, the plaintiff (non-lead graphic designer-black female) will be promoted to the printshop lead, graphic designer position. Kolbow asked to train the plaintiff and Herring said, "no". The supervisor wouldn't allow the plaintiff (non-lead graphic designer-black female) to be trained to take over the print shop lead graphic designer's position. (10)

3

One week later, the supervisor told the plaintiff and the marketing department staff the plaintiff would not be promoted to the print shop lead graphic designer position but instead the job position would be posted, and open to Gateway employees to the public. The plaintiff, with 9 years of experience, agreed to interview that day. The job was posted with an experience requirement using a printing software program (PrintSmith). (11)

The same software program Gateway gave the print shop lead graphic designer (Kolbow-Dembroski -white female) an opportunity to learn in-house for several weeks but was unsuccessful. The plaintiff (non-lead graphic designer -black female) didn't qualify to apply for the position without previous experience using the PrintSmith printing software and was not offered the opportunity to learn the program, same as Kolbow-Dembroski (white female).(12)

The employees of the Marketing department pay grades were as follows: Greg Lebrick (marketing specialist-creative-white male) was a 12, Shay Forsythe (web designer-white female) was a 12, Sandy Kolbow -Dembroski (print shop lead graphic designer-white female) was now a 12 and the plaintiff (non-lead graphic designer-black female) was a pay grade 11. (13)

Herring told the plaintiff that if she interviewed and accepted the position for the role of print shop lead graphic designer, it would be a unilateral move so her pay grade would remain at an 11. That was a deterrent as well as the PrintSmith requirement. The plaintiff didn't think it was in her best interest to apply with those deterrents in place. Herring told

4

the plaintiff, she would be a better fit for a marketing graphic designer role and she would move her into marketing instead. (14)

The plaintiff (non-lead graphic designer -black female) helped train the temporary worker and cover gaps in the printshop for the vacant role (lead print shop graphic designer position) to help with the needs of the marketing department for a year. (15)

In 2010, Gateway hired the new printshop lead, graphic designer (Annmarie Kyzub-Rueggierro – white female) and her pay grade was allocated to pay grade level 12. (16)

Herring kept putting off the plaintiff's request for reclassification of her job position to marketing level graphic designer. The plaintiff questioned Herring's supervisor, Stephanie Sklba (VP of marketing) and Bryan Albrecht (president of the college) and they directed the plaintiff back to Herring . (17)

From 2010 to 2014, Herring ignored requests from the plaintiffs (non-lead graphic designer -black female) to reclassify her position. (18)

On February 12, 2014, Annmarie Kyzub-Ruggierro shared the board agenda minutes of Greg Lebricks (marketing specialist – creative – white male) reclassification details. The plaintiff (non-lead graphic designer -black female) read the details showing Lebrick (white male) was reclassified from12 to a 13. (19)

The marketing department secretary, Diana Carbajal, asked the plaintiff if she were okay? The plaintiff shared the details of Lebrick's (marketing specialist-white male) reclassification request approval. (20)

5

Carbajal (secretary of the marketing department) told the plaintiff, Herring would fix it. Carbajal told the plaintiff that Herring wrote Lebricks (marketing specialist-creative-white male) reclassification request, and she would do it for you too. (21)

The plaintiff immediately didn't agree and specifically asked Carbajal not to disclose to Herring that she knew anything about the reclassification. The plaintiff explained to Carbajal (Secretary) that if Herring wanted her to be reclassified, she would have already done so. The plaintiff made it clear to Carbajal not to say a word to Herring because the plaintiff felt nothing good would come from it based on the history with Jacqueline Morris (22).

The Next day, February 13, 2014, the plaintiff (non-lead graphic designer-black female) is requested to the office of Herring. Herring told the plaintiff; the reason she didn't share information about Lebrick's reclassification is because she didn't think to mention it to her (A regular practice would have been to write and send the request for both positions at the same time since both employees were working and doing similar work revolving into completely different roles than their last written job descriptions. (23)

Herring volunteered to write the plaintiff's reclassification request while meeting with the plaintiff in her office. Herring emails the revised job description to the plaintiff for approval and then sends the job description to Jacqueline Morris (associate director of personnel management) on February 21, 2014, for approval. (24)

On February 23, 2014, at 3:46 PM, Morris sends the plaintiff's job description (non-lead graphic designer-black female) to the 3rd party Bjorklund Compensation Consulting

6

Agency and in doing so, also verifying the print shop lead graphic designer (Annmarie Klyzub-Ruggierro – white female) job pay grade level is a 12.(25)

On February 24, 2014, at 7:20 AM, the plaintiff sends Morris an email questioning her job title, job duties and the reclassification process stating the problems she's having with the process of reclassification. (26)

On February 24,2014 at 8:47 AM, the plaintiff received an email from Morris (HR Staffing employee) confirming she received the reclassification documents from Herring, and confirming the information was sent for review to the 3rd party Bjorklund Compensation Consulting Agency and as soon as she received the information from the reviewer; she would setup a meeting with the plaintiff (non-lead graphic designer) and Herring (Director of Marketing). (27)

On February 24, 2014, at 5:31 PM  Herring (supervisor) sends an email to the plaintiff stating, " I believe Jacqueline answered your question by indicating that she has sent the job description you agreed was properly updated outside for review. When it returns, she will sit down with us and review together. I was a little surprised by your letter to HR, et al. In that I offered at least twice to discuss the situation with you following the approval and classification of the position held by Greg and you refused to discuss it yet put out this note that you don't understand. It makes it very difficult to help someone when they refused to discuss the situation. Yet I went out on my own and rewrote your description. Your old/current description  DID show you reporting to marketing; however the money had never been transferred over. Jason, our new budget director has done so, so you should

7

not be bumping into the print shop lead position ceiling. We will need to see what the reviewer does with this position as now described". (28)

On February 25, 2014, 7:25 AM The plaintiff (non-lead graphic designer-black female) sent an email to Morris. The plaintiff copied anyone in a position of power to make changes within the college and states, " .....if this is happening to me, then someone else at the college may also be going through the same. Change starts with one person speaking out. I can't make changes at the college. I don't have the power. I selected all of you because your voices are stronger than mine. I hope you will use what I've shared and make a positive change rather than view my voice, and my thoughts as something negative". (29)

On February 26, 2014, Jacqueline Morris received feedback from the 3rd party reviewer. Bjorklund has requested assistance in evaluating the duties and responsibilities of the graphic designer position of the plaintiff (non-lead graphic designer-black female) and Bjorklund, the Compensation Consulting Agency is asking for Morris's assistance in the review to provide history to properly address the level of the position. (30)

Bjorklund Compensation Consulting Agency further stated in 2006, "the college committee expressed their agreement that there was minimal difference between the lead graphic designer and the non-lead graphic designer position and thus both positions were allocated to grade 11. Now in 2014, the College is again requesting a review of this position and has submitted a revised job description. Based on my review of the materials and the job evaluation criteria, my rating recommendation is as follows: (31)

Bjorklund (3rd party) reviewed and evaluated what was provided to them from Herring, then Morris but the information is only validated by the supervisor and if the employee has

8

any disputes from the results, there aren't any remedies except by Gateway policy to make your complaint and they'll place it in your employee file where no one sees it. There is an appeals process but if the supervisor refuses to revise and send the request to Morris, an appeal will not happen. (32)

The process starts with the supervisor approving the request, it then goes to Morris who approves the job description before it goes to Bjorklund (3rd party). By the time the job description gets to Bjorklund (3rd party) it must be approved twice. There are holes in the process that makes it discriminatory. (33)

The terminology has tremendous weight on the outcome as well as the duties and responsibilities included on the job description Bjorklund uses to determine their recommendation; the terminology used for each duty or responsibility should have specific universal terminology for several levels to choose for all employees and all positions, used for applying for a reclassification. The results should be transparent and shared at the same time Morris receives it, verifying the recommendation and the employee would be able to confirm the recommendation would be followed; leaving zero room for discrimination. (34)

In the plaintiff's case, Morris didn't provide the full history of the duties and responsibilities of the plaintiff, therefor Bjorklund made the decision based on what Herring and Morris provided. When the plaintiff contested the results and requested a revision to add those excluded duties Herring refused, and Morris, with a stern voice told Herring, Stephani Sklba, and the plaintiff, she was paid to draw and not think. (35)

9

Morris as well as the supervisor working under the authority of Gateway can bypass the system and tailor the outcome of any request for reclassification based on the terminology described for those duties and responsibilities listed on the job description being reviewed by Bjorklund (3rd party), no matter the approval of the employee. The employee doesn't have access to know the levels of terminology selected to describe the same duties performed from one employee to another; information retained in the human resource es department. Terminology used to determine the calculation of points to determine and assign their job position level, it matters. (36)

The results of the terminology used, if not done properly, negatively affects the employees pay and compensation, discriminating them by use of unfair, unequal terminology used in their reclassification process, that determins their pay and compensation. (37)

The employee's supervisor must approve the job description before it can be sent to Morris. Morris then approves and sends it to Bjorklund (3rd party). Bjorklund (3rd party) reviews the job description provided to them and makes their analysis and sends the recommendation back to Morris. (38)

Recap, Bjorklund (3rd party) gives Morris push back and wants to know why the discussion again about the print shop lead and non-lead graphic designer positions when the recommendations were made and decided back in 2006 to allocate them to 11. Morris previously revealed in the initial email to Bjorklund (3rd party) the lead graphic designer position was 12. That was not the recommendation Bjorklund gave when approving the printshop lead graphic designer position to be reallocated to 12. (39)

10

Morris as well as Herring were required to share the history of the job non-lead graphic designer (black female) position disclosing the added duties and responsibilities following the request for more history from Bjorklund. (40)

To avoid having to share the excluded duties and responsibilities with Bjorklund (3rd party) and appeal the decision; HR employees along with Herring, made the decision to permanently exclude the additional work duties and responsibilities performed by the plaintiff that significantly changed since 2006. Work performed and greatly needed to operate the marketing department and to support the operations of the college. (41)

Herring revised the plaintiff's (black female) job description in a way so it wouldn't increase her pay grade, making sure it would remain at a pay grade 11, staying within the boundaries of the job description duties and responsibilities from 2006, only revising the terminology on task without increasing the level of the problem-solving, mental effort, decision-making or administration level in comparison to Lebrick (white male) performing the same duties. (42).

On March 4, 2014, Jacqueline Morris (associate director of personnel management) announced to the plaintiff (non-lead graphic designer – black female) the job description reviewed by Bjorklund gained some points but not enough to move the plaintiff to the next pay grade therefore causing the plaintiff 's request for reclassification to be denied. (43)

Morris told the plaintiff that her education level didn't compare to her coworker (Greg Lebrick-white male). Morris told the plaintiff that Greg Lebrick (Marketing Specialist-Creative-white male) had a journalism BA degree, and she had a degree in art and said it

didn't compare. Morris held one hand low and held one hand high and said this is how you compare to Lebrick. Lebrick is up here, and you are down here. Morris told the plaintiff, "You have a degree in art. Why would anybody go to college for art? You don't need a degree in art, you can do that on your own time," and chuckled about it. Afterward the plaintiff did her own research on the matter. (44)

The plaintiff asked Jacqueline if she could create a new position around her strengths as a creative director and Jacqueline said, "That's Jayne's job, she's the art director! Morris became heated. She became stern with the plaintiff stating, "we pay you to draw".

The plaintiff asked Herring to tell Morris about the duties she performed in the marketing department. Stephanie Sklba (vice president of marketing) stated, "yes Jayne, what does Sandra do? Herring replied, "Everything" . (45)

Jacqueline Morris (associate director of personnel) became upset and elevated her voice in a stern tone and said," WE PAY HER TO DRAW AND NOT THINK". (Herring was startled) The plaintiff asked Morris again about the creative director position. Morris looked directly at the plaintiff (non-lead graphic designer -black female) and said in a stern voice, "WE PAY YOU TO DRAW AND NOT THINK. YOUR JOB IS TO CHANGE THE COLOR RED TO BLUE, THAT IS YOUR JOB!" The room became quiet. (46)

Herring (director of marketing - supervisor) began packing up her belongings and said to the group, "I have another appointment that I need to go to, I'm sorry". Then left.

The plaintiff remained with Morris and Sklba. Morris mentioned the EEOC and explained Lebricks (marketing specialist-creative-white male) job position and the plaintiffs job position (non-lead graphic designer) were not similar so no need to bother.

12

She told the plaintiff that her job position would always remain the same at Gateway. Morris told the plaintiff if she chose to stay at Gateway, she could do volunteer work any time she felt bored. Morris said, that's what she did, and got paid for it .(47)

The next week Herring comes in the office and gives the plaintiff a mockup of the board member page to layout and work on. Odd, the plaintiff has a brief discussion to Herring about what is this? Why? Herring replies, "Just do it! The plaintiff gives Herring push back, "this isn't how I do my work". Herring repeats herself, "Just do it". Herring is acting in her role as a creative director, a role that she's not accustomed to unless there are only revisions required. Herring began this role with the board member page project. The plaintiff completed the work as she asked. The plaintiff continued all the work, just as Herring asked. The plaintiff's workload decreased to having zero work given to her to complete (48).

In August The plaintiff was contacted to engage in mediation to resolve the complaint filed with the EEOC. Debbie Miller (Director of HR) met and agreed to a resolution that should have ended the complaint. Both parties agreed but Gateway didn't follow through on the agreement. (49)

Moving forward, Herring transferred the blame on the plaintiff (non-lead graphic designer – black female). Herring stated the plaintiff volunteered to perform duties that significantly changed from her job description since 2006 and told the plaintiff those duties would no longer be needed therefore; she refused to add and revise the job description. Miller (director of HR) didn't intervene but only made it known that if Morris had not hurt her back she would be there to decide on whether Herring was correct in her decision to

13

exclude the plaintiff's duties and responsibilities from her job description. Miller stated that she didn't have the expertise to make the decision herself without Jacqueline Morris's opinion. Then she stated since Morris isn't here, we'll have to take the word of the supervisor (Jayne Herring, director of marketing). (50).

The abuse of power and authority by Herring and Miller, was used to control the plaintiff's pay and compensation by excluding the plaintiff's duties and responsibilities and using low level terminology to describe those duties, and by refusing to allow Bjorklund (3rd party) to properly review her job description negatively effecting the Plaintiff's point calculations determined by the plaintiff's job description used by Bjorklund (3rd party) to properly address the level of the position, directly effecting the plaintiffs pay and compensation. (51)

Moving forward, Herring used her abuse of power to direct the plaintiff's work displaying a downward progression, underrating her performance used to justify multiple retaliatory and hostile actions towards the plaintiff to conceal her deficiencies in creative direction, and unethical acts of HR's reclassification practices. The abuse of power resulted in the plaintiff reporting multiple claims to the EEOC for discrimination and retaliation. Claims that threatened to reveal the acts that Herring, Morris, and Miller worked hard to conceal by deceiving the plaintiff and conspire to fail her for a basis to terminate her employment. (52)

Herring refused to revise the plaintiffs job description, Miller (director of HR) sent a revised job description for Herring, august 22, 2014 (describing her mental effort, decision-making and problem-solving, duties and responsibilities with a lower terminology in

comparison to her coworkers (lebrick (white male) and Klyzub-Ruggierro (white female). The plaintiff would not approve the revision that also excluded duties and responsibilities. (53)

With the direct statement from Morris telling the plaintiff, "SHE GETS PAID TO DRAW AND NOT THINK" in addition to Herring (Director of Marketing-supervisor) excluding duties, telling the plaintiff she volunteered to work outside the duties listed on her job description since 2006. (Duties including logo design, reduced to designing only identities and not logos any longer, identities described as typed words displayed with the Gateway logo brand as the prominent part of the identity, any interactive media, web design, hyperlinks, flipbooks, wall murals of any kind was no longer needed) and describing the remaining duties with less mental effort and decision-making and all while Debbie Miller (Director of HR and Title VII civil rights 1964 representative) refusing to address the problem, caused the plaintiff to lose morale and motivation. (54)

The acts from Herring, Miller, and Morris were not transparent to the other employees in the marketing department or other Gateway employees throughout the college or staff which directly contradicted what was happening behind closed doors.

By retaining all discussions to the HR staff, the plaintiff was depicted as being difficult, noncompliant, irate, underperformer, refusing to work up to her potential because Lebrick was reclassified. The fact was Lebrick (white male) deserved to be reclassified, but the plaintiff was also qualified to be reclassified but was discriminated in achieving the same opportunity as Lebrick (white male) negatively effecting the Plaintiff's point calculations determined by the plaintiff's job description used by Bjorklund (3rd party) to

15

properly address the level of the position, directly effecting the plaintiffs pay and compensation . The plaintiff wasn't jealous or upset about Lebrick. (55)

The fact was the plaintiff was confused over her results and the explanation provided from Morris wasn't adding up.

The decisions to exclude the plaintiff's duties and responsibilities, in addition to Herring's new assumed role as creative director, led to the issues that affected the performance of the plaintiff (non-lead graphic designer-black female), which effected the needs of the marketing department and the operations of the College. (56)

Kristin Gunia (marketing of high school materials – white female) requested an interactive flyer to be created by the plaintiff (non-lead graphic designer). The plaintiff revealed to Gunia, she was told by Herring those duties were no longer needed, and it was voluntary. The plaintiff asked Gunia to confirm with Jayne Herring if creating interactive flyers were going to be added to her job description? Herring confirmed by email that she agreed with Kristin, however the two would not share what they agreed. Herring would not confirm, Gunia was upset. The plaintiff created the work, excluding interactivity. (57)

Herring underrated the plaintiff's performance evaluation in 2015 to punish the plaintiff for filing EEOC claims, plaintiff was successful at completing and following Herring's directions. (58)

Herring refused to acknowledge the plaintiff's role and continued to exclude the duties and responsibilities from the plaintiff's job description, avoiding disclosing the history to Bjorklund (3rd party). (59)

16

Herring continued her creative role. She wasn't sure how to direct the work, whether it was a logo or flyer, it didn't matter. Miller asked the plaintiff to explain to Jayne how to lay out a poster. (60)

During the reorganization chats between the plaintiff and Herring. Herring confirmed the plaintiff's role would stay put exactly, excluding high school events that Kristin Gunia would manage as the High school recruiting manager in the Marketing department. (61)

Herring demoted the plaintiff's duties, blocker the plaintiff from counseling customers, and underrated the work she produced following Herrings creative role. When the plaintiff complained, Herring transferred her duties to Gunia. (62)

Herring struggled to direct the work, and Gunia frustrated. Neither Herring or Gunia had the background or experience to fill the role as creative director. (63)

By august 17, 2015 Herring was desperate for the roles to switch back to the past, but Herring still refused to revise the plaintiff's job description. Herring flipped the script and instead told the plaintiff it was her role to create the layout and design but also be responsible for the creative direction, labeling it creative design and telling the plaintiff she isn't using her creative design skills or asking the right questions **(audio).** The plaintiff continued to design by Herring's creative direction. Herring punished the plantiff by adding more restrictions and barriers until the plaintiff no longer made any decisions, very little problem solving and zero administrative duties. Each time Herring violated the plaintiffs rights the plaintiff filed more EEOC complaints. (64)

Not long after, (marketing of high school materials – white female) Gunia was promoted to traffic manager in the marketing department working under Jayne Herring (director of marketing-supervisor). Gunia would take on the creative role. (65)

The plaintiff (non-lead graphic designer-black female) received another underrated performance review, affected by the interference and abuse of power by Jayne Herring (director of marketing-supervisor) and approved to do so by Debbie Miller (director of HR). (66)

Moving forward, Kristin Gunia (marketing traffic manager - white female) would be the contact and manager of the projects assigned to the plaintiff (non-lead graphic designer – black female). In 2015 and 2016 Gunia would meet, manage and provide creative direction to the plaintiffs to complete projects as her new role as a manager. (67)

In 2015, the annual catalog was removed and transferred to Klyzub -Ruggiero (print shop lead graphic designer-white female), and the plaintiffs catalog project was replaced with a cluster brochure project, assigned to Kristin Gunia. (68)

The plaintiff was instructed not to contact Gunia but instead direct all questions to Steve Kratochvil. (69)

From that point on, the plaintiff (non-lead graphic designer) was barred from communicating directly with Gunia (white female) for the cluster brochure project and to other customers of the college; a role transferred to Gunia that used to be the duties and responsibilities of the plaintiffs. (70)

On June 16, 2015, the plaintiff was threatened into signing resignation papers from Herring and William (Bill) Whyte (VP of the Human Resources Department) for filing EEOC complaints. The plaintiff refused to sign. (71)

On June 18, 2015, 12:56, Kelly Bartlett (president's office secretary), offers a meeting time at 4 pm on June 18, 2015. The plaintiff accepts (72).

On June, 18, the plaintiff met with the president of the college, Bryan Albrecht along with William Whyte acknowledging the EEOC complaints and what White said about the plaintiff filing the EEOC complaints because he said the plaintiff was angry, the threat made by White stating, " I hear you have a review coming soon, it'll be in your best interest to sign the resignation papers" a threat made by White, in the presence of Herring. To confirm with Albrecht and Whyte that the plaintiff wasn't interested in resigning. (73)

Whyte said, " he didn't mean it as a threat and chuckled a bit" The plaintiff told Albrecht and Whyte she wasn't angry and she filed the complaint because she was being discriminated her pay grade, it should be a 12, not an 11. (74)

She explained to Albrecht that Herring approved Kristin (white female) to manage her projects, specifically, the cluster brochures and explain they're not done because of extensive and repetitive content changes to the layout after the layout was already approved. Albrecht was visibly upset to hear Gunia was managing the work and not Herring. (75)

Whyte admitted that he thought resigning would be the best option and it was on the table if the plaintiff changed her mind. Albrecht told the plaintiff she didn't have to resign if

she didn't want to and if she had any more problems to come see him. The meeting was over. (76)

On June 18, Herring said she was asked to put the plaintiff's performance evaluation on hold because the plaintiff had a meeting scheduled with Albrecht and Whyte. (77)

On July 23, Herring gave the plaintiff an underrated performance evaluation giving her an unacceptable rating in numerous categories fulfilling the threat made by Whyte on June 16, 2015. (78)

On July 30, 2015 Herring became verbal and physically hostile towards the plaintiff yelling " I CAN"T TAKE IT ANY LONGER" and breaking pens in the plaintiff's face after the plaintiff walked into Herrings office to question her on directions provided for a rush project due within hours. The plaintiff reported the incident to Stephanie Sklba and filed an incident report to the Maxient Care team at Gateway Technical College. Tammi Summers, from the care team, responded about the incident, but Debbie Miller interfered excusing Tammi Summers from her duties and instead made it mandatory for the plaintiff to meet with Miller instead of Summers. (79)

The plaintiff was threatened by Miller to begin a performance improvement plan on November 6 of 2015, when Herring made an accusation that the plaintiff ordered the wrong quantity of booklets for Jennifer Charpentier (Executive of Gateway Foundations). (80)

Herring's accusations revealed to be false, the PIP sent from Miller (director of HR) was put on hold again and instead evolved into monthly meetings with Herring in January, February, and March of 2016. Miller made herself available as a third person. (81)

20

The plaintiff's option for a third person were Miller, Frost or Morris only. It was made clear those were the only advocates she could bring to those meetings. The plaintiff successfully completed the meetings ending on March 29, 2016. (82)

In June of 2016, the plaintiff received another underrated evaluation by Herring and acknowledged by Miller. The projects identified were Budget Book Cover, Cost Estimate, and the Horticulture Workshop flyer. In addition to the IT emergency in the Marketing department in March of 2016 after Herring couldn't substantiate her accusations, she recanted her statement but not before causing a hostile strain on the plaintiff and Miller because her accusation was frivolous. (83)

Herring still refusing to revise the plaintiff's job description, even after Miller advised her to on March 29, 2016, to let the plaintiff counsel customers again, Herring pressed hard for the PIP. (84)

On June 22, Herring notifies the plaintiff she must participate in a performance improvement plan (PIP), and on June 28, the plaintiff receives an out of office email from Miller. Miller understood the plaintiff's job description wasn't reflecting her on-the-job duties and didn't take the initiative to revise and appeal but instead left.(85)

On June 28, 2016, John Frost (director of employee/labor relations, payroll and safety/security of Gateway Technical College) emails the plaintiff stating Miller is on vacation and he will be facilitating the performance improvement plan discussion instead of Miller. (86)

John Frost and Herring initiated a performance Improvement meeting for July 29, 2016. (87)

On July 29, 2016, the plaintiff took a vacation day, worked on June 30, 2016, was ill on Friday, July 01, 2016, Monday, July 4 was a holiday, and the plaintiff went on Family Medical Leave from July 5, 2016, until July 27 of 2016. Herring sent a meeting request on July 28, 2016, for the performance improvement plan meeting to be set for July 29, 2016 at 10 a.m. (88)

The plaintiff requested to have an advocate for the meeting. Frost denied the request. Herring rescheduled the meeting on July 29, 2016, for the PIP on August 1, 2016. The plaintiff scheduled a vacation day. On August 1, 2016, Herring rescheduled the PIP at 11:00 a.m. on August 2, 2016. (89)

On August 2, the plaintiff is requested to attend the PIP meeting facilitated by John Frost and managed by Jayne Herring. The plaintiff (non-lead graphic designer-black female) emailed Miller but only received an out of office reply. The plaintiff attended the meeting on August 2, 2016, without an advocate (90)

Frost stated at the start of the meeting, "nothing said during the meetings with Miller mattered". Frost and Herring stated they were moving forward with the performance improvement plan. Frost informed the plaintiff to share any complaints and to submit any complaints to the human resources department where the plaintiff's complaints would be placed in her employee file and remain. The goal of the meeting was to tell the plaintiff to return the level of her work back to the way it was in the first 13 years of her employment. Frost stated, " It's best for everyone involved". (Audio transcripts from PIP meeting:(91)

22

Herring stated the college was in greatly need of the Plaintiff (non-lead graphic designer-black female) to perform work at the level as a season level graphic designer. Herring noted that Kristin Gunia (newly promoted to the traffic manager position) and Michelle Quinn (instructor at Gateway and newly appointed consultant for Herring and Gunia) went to an Ad agency to look at the traffic manager position. Herring stated " also, we're trying to gather information about creative briefs and what role that has in communicating on a very consistent basis the expectations for a given project". (92)

The guidelines of the PIP plan were as follows:

The PIP began in August of 2016 and run through September 16, of 2016. Meetings were weekly with Herring and Gunia. (93)

The plaintiff attended the meetings, engaged with Herring and Gunia, advised Herring on logo direction and had very good talks and it seemed to be going in a better direction. Both Herring and Gunia were improving and during the end of the last meeting Herring and Gunia gave the plaintiff an underrated review of the PIP and shared the results with Frost. Weekly meeting with Herring and Gunia on 08/11-08/18-08/24-08/30-09/08-09/12-09/16. Herring underrated the scores on the PIP as unacceptable in every category. (94)

Frost used the failing PIP to place the plaintiff on a discipline plan, documented the accusations from Herring and Gunia, and used the accusations to create a trail of negative performance, initiating the plaintiff to be placed on a discipline plan September 16, 2016 The plaintiff met with Herring on the results of the Performance Improvement plan. The plaintiff completed the PIP plan with Herring as Frost instructed her to do. (95)

On October 21, 2016 Herring clarified to the plaintiff that her unacceptable rating factor for the PIP has now been changed to a pass/fail rating so instead of the plaintiff receiving the unacceptable scores she will receive a fail score that will also be used for the discipline plan, the scores will be pass/fail. (96)

The plaintiff was placed on a discipline plan with added restrictions and barriers. The plaintiff, required to use specific words, told what questions to ask when communicating with customers, new 48 hour project deadline, a pass/fail grade for projects, must pass project critique on the first round of a mockup, reply to customer emails copying Kristin Gunia or Herring on every communication or risk receiving a failing review, required to ask the right questions when Herring and Gunia requested a project, could not speak with customers as it pertains to graphic design outside of their predetermined script. None of the required items to perform on this plan were required at any given time from the other designers or by the plaintiff before she filed EEOC claims. (97)

The plaintiff was told the PIP and discipline plans were for her benefit to help her improve but instead were plans to force her to fail so they could terminate her negatively effecting her livelihood. (98)

In addition, required to complete any jobs needed for Annmarie Klyzub-Ruggiero (print shop lead graphic designer) required to contact Gunia and Herring by email each morning asking if they had any rush jobs, logging all jobs manually onto an excel sheet and reorder jobs in sequence by their deadline at the start of the day and throughout the day as additional jobs come in from Gunia, Herring, or other staff until the end of the day while

working to complete all projects in 48 hours. Putting hot jobs to the top of the excel list but only after getting approval from Gunia or Herring. Frost stating to the plaintiff, "jobs are not hot if they aren't approved by Gunia or Herring, you don't get to decide that" (99)

The plaintiff was placed on a discipline plan and attended meetings with Herring, Frost and Gunia on October 21, 2016, and November 16, 2016.

While the plaintiff was on family Medical Leave Gunia interfered with the plaintiff's work, disciplining the Plaintiff for missing work requests and deadlines, then terminating her less than 28 days later. The plaintiff received underrated reviews throughout the discipline plan with a pass/fail rating, Herring and Gunia gave the plaintiff failing scores resulting in a suspension on December 14, confirmed termination dated December 19, and fired on January 2, 2017. (100)

Complaints to the EEOC threatened an investigation that would reveal the abuse of power and authority against the plaintiff as well as revealing the weakness in Herring and Guni's creative role, and misleading practices in Gateway's human resources department regarding their reclassification and other procedures. (101)

Herring, Frost, and Gunia fired the plaintiff (non-lead graphic designer-black female) to stop receiving more the EEOC complaints, and forever conceal the discrimination and unethical acts, protecting them , and the other employees working under the authority of Gateway Technical College including Jacqueline Morris, Debbie Miller, Stephanie Sklba, William (Bill) White, and Bryan Albrecht from consequences of their actions towards the plaintiff, harming the plaintiff's (non-lead graphic designer -black female) lively hood that

would extend for the next 9 years for filing EEOC claims to defend and protect her civil and

constitutional rights against the group. The plaintiff was fired January 2, 2017.

In January 2017 no evidence was found during the unemployment investigation.

The investigation determined the plaintiffs discharge was not for misconduct or substantial

fault connected to her employment. The facts showed the employer didn't provide correct

and complete information during a fact-finding investigation on a written request dated

01/09/17. (102)

The retaliation continued throughout the plaintiffs journey to find successful work

after the termination. The plaintiffs' lawyer filed perjury and requested to terminate his

position late in the case in April of 2024. (103)

The case has been in the court system for years while the plaintiff suffered

termination, limited job offers, defamation of character and humiliation for acts of the

employees at Gateway Technical College. The case was dismissed November of 2017,

showing inaccurate statements submitted by Gateway Technical College. After the case

was dismissed Gateway Technical College human resources department listed a job

posting for Marketing Graphic Designer – Creative. (104)

One year after terminating the plaintiff. A job description consisting of duties

needed for the marketing department success and the operations of Gateway Technical

College that should've been the revised job description for the plaintiff's non-lead graphic

designer -black female) honoring the plan to reclassify the plaintiff's job position discussed

with Herrin back in 2009. (105)

In 2018 the case was appealed and went to mediation although the mediation wasn't successful. Moving forward, the plaintiff's lawyer used excerpts taken from earlier depositions to answer specific questions pertaining to the reclassification or entered no dispute at all on the plaintiff's response without communicating with the plaintiff. (106)

Information and details about the reclassification, audios, and transcripts provided were never introduced or discussed with the plaintiff during the summary judgement even after the plaintiff made it clear that she wanted to be involved. The plaintiff was not aware the information she shared when answering specific tailored questions would be used as her only defense in the summary judgement. (107)

When the plaintiff confronted her lawyer, she was met with aggression and hostility and subsequently her lawyer resigned as counsel, no longer representing the plaintiff. The plaintiffs attempt to find another lawyer was unsuccessful and met with a conflict of interest. (108)

The plaintiff has been unsuccessful at replacing her career but found work in various other careers in warehousing and retail but never replacing her promising career as a graphic designer on the marketing level at Gateway Technical College. The plaintiff was fired at the age of 47 years and the plaintiff will be 56 in the year of 2025. The odds of finding work comparable to the plaintiff's career is low based on an 8-year gap from working in the field of graphic design, reporting being fired for poor performance, reference checks for work at the place that you were fired, and AI resume automatic selection of candidates 40 years or younger. (109)

In November of 2023, the plaintiff (non-lead graphic designer – black female) was a top candidate inline to be hired as a Communication Manager for the National Association of Congressional Christian Churches in Oak Creek, WI offering a salary of 60,000 to 70,000. On November 26, the plaintiff was invited to interview by Zoom with Ashley Cleere and her associate Kristin Ward. During the interview Kristin Ward recognized Jennifer Charpentier, Executive Director of Gateway Technical College Foundation. Two days later, the employer, Ashley Cleere sent an email to the plaintiff, stating they're focused for the position had changed and were instead going to focus on individuals with broader experience that includes website development and social media promotion. (110)

The plaintiffs most recent position is a substitute teacher, and the plaintiff is only employed for 9 out of 12 months during the fiscal year for this position. The anxiety, mental and emotional damage continue including defamation of character. (111)

The plaintiff claims include:

**Title VII Civil Rights of 1964 and Section §1983 Retaliation**

Herring—acting under color of state law—purposefully discriminated against her because sex, race discrimination, and pay and compensation discrimination. Jacqueline Morris, state employee, allegedly abusing her power of authority, misleading, and not following a regularly adopted policy, practice and procedures of reclassifying employees to get the recommendation of Bjorklund Compensation Consulting before assigning the pay grade, of the plaintiff, working for the state of Wisconsin at Gateway Technical College negatively effecting the Plaintiff's point calculations determined by the plaintiff's job description used by Bjorklund (3rd party) to properly address the level of the position, directly effecting the plaintiffs pay and compensation.

Jayne Herring, state employee, allegedly abusing her power of authority, excluding duties performed by the plaintiff and using low level terminology describing mental effort, problem-solving, and decision-making in comparison to the plaintiff's coworkers (Greg Lebrick (white male) and Annmarie Klyzub-Ruggierro (white Female) and refusing the request to resolve and revise the plaintiff's job description, negatively effecting the Plaintiff's point calculations determined by the plaintiff's job description used by Bjorklund (3rd party) to properly address the level of the position directly effecting the plaintiffs pay and compensation.

*See Guy v. State of Ill.*, 958 F. Supp. 1300, 1307 (N.D. Ill. 1997) citing *Forrester v. White*, 846 F.2d 29, 32 (7th Cir. 1988). The same burden-shifting method for proving Title VII discrimination applies.." *Salas v. Wisconsin Dep't of Corrections*, 493 F.3d 912, 926 (7th Cir. 2007).

29

Section §1983 retaliation claim against Gateway employees can stand because, the plaintiff has the right not to be retaliated against for filing a charge of discrimination, a right created by statute, specifically Title VII, Civil Rights of 1964, Harris v. Harvey, 605 F.2d 330, (7th Cir. 1979), cert. denied 445 U.S. 938 (1980). The Seventh Circuit Court of Appeals Accordingly, "[a] retaliation claim may be brought under Title VII Civil Rights of 1964 or another applicable discrimination statute, which provides a remedy for the deprivation of constitutional rights violating the 14th amendment Equal Protection Clause." *Id.*; *see also Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's) the right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII Civil Rights of 1964.

**Pursuant to Title VII Civil Rights of 1964 Retaliation Section 1981**

Gateway underrated her performance, placed her on action plans, and terminated her employment in retaliation for filing charges of discrimination against the College. *Robertson v. Dep't of Health Svcs.*, 949 F.3d 371, 378 (7th Cir. 2020); *Liu v. Cook Cnty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The substantive standards and methods of proof that apply to Title VII Civil Rights of 1964 retaliation claims also apply to a violation of the plaintiff's constitutional rights, 14th amendment of the equal protection clause…..claims under 42 U.S.CC. §1981."). The plaintiff can establish a *prima facie* case or pretext in relation to her retaliation claims.

The plaintiff's also suffered: disparate treatment, disparate impact, defamation of character and retaliation, hostile work environment, and emotional distress (see plaintiff's brief).

## FAMILY MEDICAL LEAVE (FMLA)

The plaintiff has the right to take FMLA without being negatively affected by her employer regarding discipline and termination. Family and Medical Leave Act prohibits disciplining an employee for days of FMLA leave.

The plaintiff was disciplined for missing deadlines of work distributed to her email while she was on Family Medical Leave. The plaintiff was denied transparency of the missed work. The Plaintiff's manager interfering with the plaintiff's work duties emailed while on FMLA leave negatively affecting the results of her discipline plan causing a fail-rating, resulting in termination 28 days later violating Family Medical Leave Act (FMLA). Family. *Meyer v. DHSS (Wis. Pers. Comm'n, 06/11/92), the Family and Medical Leave Act (FMLA), Haas v. DILHR, 166 Wis. 2d 288 (Ct. App. 1991)*

**Other claims include:**

1.) **Equal Pay Act (EPA)-** prohibits sex-based wage discrimination between men and women. Plaintiff was treated unfairly, by sex discrimination. The plaintiff (black female) has a right to equal pay for equal work, equal skill, effort, and responsibility regarding duties described on the plaintiff's job description used to determine pay grade in comparison to her coworker (white male).

2.) **Wisconsin Fair Employment Law** - prohibiting discrimination. The plaintiff has a right to work free of discrimination and harassment (hostile working environment) for opposing unlawful employment practices, filing EEOC claims.

31

Sincerely,

Sandra Gray-Rohan
8000 Waters Avenue #39
Savannah, GA 31406
Grayrohan19@gmail.com

Sent to:
Quarles & Brady LLP
Lindsey W. Davis,
Sean Scullen
411 East Wisconsin Avenue
Suite 2400
Milwaukee, WI 53202-4428